Fill in this information to identify the case:

Debtor Name  Misen Inc.

United States Bankruptcy Court for the: Northern District of California
                                                                           (State)

Case number: 23-50767

☒ Check if this is an amended filing

Modified Form 425A

# Plan of Reorganization for Small Business Under Chapter 11      02/20

## Debtor Misen Inc.'s First Amended Plan of Reorganization, Dated August 1, 2023

### Background for Cases Filed Under Subchapter V

**A. Description and History of the Debtor's Business**

1. <u>Executive Summary.</u>  Under this Plan of Reorganization (the "<u>Plan</u>"), Misen Inc. (the "<u>Debtor</u>" or "<u>Misen</u>") is borrowing up to $4,000,000 in debtor-in-possession financing (the "<u>DIP Loan</u>" or "<u>DIP Financing</u>") funded by a subset of current investors in the Debtor, including those holding convertible notes (the "<u>Convertible Noteholders</u>") and certain holders of equity and certain third parties (collectively, the "<u>DIP Lender</u>").  The DIP Loan and the Plan together represent Misen's last and best hope to survive as a going concern, pay all secured and priority claims in full, and provide a meaningful dividend to general unsecured creditors.  The alternative is a forced liquidation under chapter 7 of the Bankruptcy Code, likely resulting in only partial payment to Misen's senior secured creditor and no meaningful payment at all to unsecured creditors.  Efforts dating back over a year to raise money from investors, borrow money from various lenders, achieve out-of-court consensual settlements with creditors, or some combination of all of those initiatives, have not succeeded.  Misen believes the Plan represents the only viable path forward under the circumstances.

On the date the Plan becomes effective (the "<u>Effective Date</u>"), the first $1,000,000 of the outstanding balance of the DIP Loan will remain as debt on the balance sheet of the reorganized Debtor.  The equity of the reorganized debtor will originate from two sources: first, the remaining up to $3,000,000 in DIP Loan liabilities will convert to a 47.7% equity interest in the reorganized Debtor, and second, the remaining 52.3% equity interest in the reorganized debtor will be as a result of prepetition claims and interests of a combination of legacy creditors and equity holders. Specifically, the Convertible Noteholders participating in funding the DIP Loan (the "<u>Participating Convertible Noteholders</u>"), as a result of being creditors, will convert the pre-petition debt owing to them into equity in the reorganized Debtor amounting to 10.1% of total equity.  Further, the investors in the DIP Loan, as a result of being shareholders, will convert a subset of pre-petition equity interests into equity in the reorganized Debtor amounting to 42.2% of total equity (the "<u>Pull Through</u>").  Upon the Effective Date, all existing equity holders and holders of stock options, other than those shares subject to the Pull Through, will have their equity interests and options canceled and the only issued and outstanding equity in the reorganized Debtor will be as set forth above.

The Debtor's senior secured debt was paid off prior to the Effective Date via DIP Loan funds. All other creditors will be paid on or shortly after the Effective Date (with the exception of certain priority claims and administrative expense claims described below), including an immediate distribution of $214,064.02 (the "Pot") to the general unsecured creditors (collectively, the "GUCs") who are impaired under the Plan and consist primarily of trade vendors and service providers. The funds to pay the GUCs will come from an advance under the DIP Loan (which will convert to an exit facility (the "Exit Facility") on the Effective Date). Those Convertible Noteholders not participating in the funding of the DIP Loan (the "Non-Participating Convertible Noteholders") will also receive a small distribution of approximately $16,000 in the aggregate.

All creditors are projected to fare **significantly** better than they would if the Debtor's case converted to one under chapter 7 of the Bankruptcy Code[1] and required forced liquidation of all of its assets. Indeed, in a chapter 7 scenario, the Debtor's senior secured lender is projected to be significantly impaired and the GUCs would receive nothing.

2. Introduction. The Debtor, as debtor and debtor in possession, proposes this Plan of reorganization under subchapter V of chapter 11 of the Bankruptcy Code.

Pursuant to General Order 37 issued on January 30, 2020, by the Hon. Charles Novack, Chief Bankruptcy Judge for the United States Bankruptcy Court for the Northern District of California, and the Court's *Order Setting (A) Status Conference; (B) Claims Bar Date; (C) Deadline for Election Under 11 U.S.C. § 1111(b)(2); and (D) Other Deadlines (For Use Only in Cases under Subchapter V of Chapter 11)*, the Debtor has prepared and submits this Plan and provides the below description and history of its business operations, liquidation analysis, and projections in accordance with section 1190 of the Bankruptcy Code.

3. Brief History of the Debtor's Business. Misen is a Delaware corporation founded in 2015 by Omar Rada with a simple goal: to make premium-quality kitchenware more affordable. As a passionate home cook, Mr. Rada knew the difference that quality tools can make in the kitchen. However, due to traditional retail markups, high quality products made of premium materials are often out of reach for many consumers. Misen's strategy is to cut out the middleman and deliver superior value directly to the consumer. Misen's first product, a Chef's Knife, was launched on the crowdfunding platform Kickstarter in 2015. The product launch was met enthusiastically by a community of early supporters, and over the subsequent years, through a combination of Kickstarter-led product launches and social media marketing, Misen expanded its product assortment, customer base, and revenue meaningfully. Today, Misen sells an array of high quality knives, cookware, and prep tools on misen.com and on Amazon. Over the years, Misen has stood by its commitment to deliver strong value to its customers, which is illustrated by the low single-digit rate at which customers return their purchases to the company. Misen is an online only business with no physical presence or retail stores with its most senior employee, the Vice President of Operations, based in the Bay Area.

4. Events Precipitating the Debtor's Chapter 11 Petition. The events that led to Misen's bankruptcy filing began in late 2021 and early 2022. Misen's business benefited from the COVID-19 pandemic and associated home-sector consumer purchasing. This led Misen to overestimate demand at the end of 2021 and purchase too much inventory. Not only did the

---

[1] Unless otherwise indicated, all section references in this Plan shall be to title 11 of the United States Code (the "Bankruptcy Code").

company over-purchase inventory, the inventory that it purchased was brought in at peak freight rates, also an effect of the pandemic. This meaningfully reduced product margins.

Moreover, during 2020, Misen increased the size of its team (and accordingly, its overhead) in anticipation of further increased demand. However, this demand never materialized. Part of this demand miss was driven by changes in the advertising market; in the spring of 2021, Apple implemented significant changes to its iOS 14.5 operating system that greatly hurt the efficacy of paid-social marketing platforms such as Facebook and Instagram. These paid-social platforms represented a material portion of Misen's marketing spend and revenue generation, so those changes had a material negative impact on the business.

In total, lower revenue and higher costs (both fixed and variable) led to Misen losing a considerable amount of money in 2021 and first half of 2022, the total of which was greater than the sum of the company's accumulated equity capital to date. During this time, Misen attempted to raise equity capital, but was unsuccessful in its efforts as the business cycle turned, triggered by hardening inflation and the associated rapid raising of interest rates by the Federal Reserve.

Beginning in the third quarter of 2022, Misen took several drastic measures to survive, beginning first with reducing its team size from over forty employees to just ten today. Second, Misen reduced its spending on products and services. Third, Misen decreased marketing spend by over 80%, which (roughly) cut its run-rate revenue in half. Fourth, Misen in-sourced a key contract in a bid to make a key sales channel less unprofitable.

Ultimately all of these measures were taken too late. Although Misen did not know it at the time, by the time it began to react at the end of the second quarter of 2022, it had already lost too much money to earn its way out of its problems, and continued adverse capital raising conditions ensured that it would need to restructure its balance sheet. Misen was in default with its senior-secured lender, in default on its convertible bridge notes, and in default on its accounts payable with many vendors and service providers.

B. **Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. The liquidation analysis is attached to the Plan as **Exhibit A**.

C. **Ability to make future plan payments and operate without further reorganization**

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the debtor's business.

The Plan Proponent has provided projected financial information as **Exhibit B**.

The Plan Proponent's financial projections show that the Debtor will not have projected disposable income (as defined by § 1191(d) of the Bankruptcy Code) for the period described in § 1191(c)(2) and is instead projected to lose $317,920.39 during that time, but the Debtor will have availability under the Exit Facility to fund the Pot on the Effective Date in order to create a recovery where there would otherwise be none.

The final Plan payment is expected to be paid on or before **September 30, 2023**.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

## Article 1: Summary

This Plan under chapter 11 of the Bankruptcy Code proposes to pay creditors of Misen Inc. from the DIP Loan**.**

This Plan provides for:

| | |
|---|---|
| 1 | class of priority claims; |
| 2 | classes of secured claims; |
| 2 | classes of non-priority unsecured claims; and |
| 1 | classes of equity security holders. |

Holders of secured claims will receive payment in full from the DIP Loan before the Effective Date of the Plan. Non-priority unsecured creditors holding allowed claims will receive distributions, which the proponent of this Plan has valued at approximately **5 cents** on the dollar. This Plan also provides for the payment of administrative and priority claims.

All creditors and equity security holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their claim. A disclosure statement that provides more detailed information regarding this Plan and the rights of creditors and equity security holders has been circulated with this Plan.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. If you do not have an attorney, you may wish to consult one.**

## Article 2: Classification of Claims and Interests

| | | |
|---|---|---|
| 2.01 | **Class 1** | All allowed claims entitled to priority under § 507(a) of the Code (except administrative expense claims under § 507(a)(2), and priority tax claims under § 507(a)(8)). |
| 2.02 | **Class 2** | The secured claims of the following creditors, to the extent allowed as a secured claim under § 506 of the Code. |

| | | |
|---|---|---|
| | (a) Merchant Financial Group | $1,677,074.57 |
| | (b) Saddle Creek Logistics | $348,811.78 |

| | | | |
|---|---|---|---|
| 2.03 | **Class 3** | All non-priority unsecured claims allowed under § 502 of the Code. | |
| | | (a)(i) Non-Participating Convertible Noteholders | $16,246.66 |
| | | (a)(ii) Participating Convertible Noteholders | Accepting approximately 5% in the form of preferred equity in the reorganized debtor |
| | | (b) General Unsecured Claims | [$197,817.36] |
| 2.04 | **Class 4** | Equity interests of the Debtor including unexercised and unexpired stock options | |

## Article 3: Treatment of Administrative Expense Claims, Priority Tax Claims, and Quarterly and Court Fees

| | | |
|---|---|---|
| 3.01 | **Unclassified claims** | Under section § 1123(a)(1), administrative expense claims, and priority tax claims are not in classes. |
| 3.02 | **Administrative expense claims** | Each holder of an administrative expense claim allowed under § 503 of the Code, will be paid in full on the Effective Date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor. |
| 3.03 | **Priority tax claims** | Each holder of a priority tax claim will be paid on account of their allowed claim in regular installment payments within three years consistent with section 1129(a)(9)(C) or such earlier time as determined by the reorganized Debtor in its discretion. |
| 3.04 | **Statutory fees** | All fees required to be paid under 28 U.S.C. § 1930 that are owed on or before the Effective Date of this Plan have been paid or will be paid on the Effective Date. |
| 3.05 | **Prospective quarterly fees** | All quarterly fees required to be paid under 28 U.S.C. § 1930(a)(6) or (a)(7) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code. |

## Article 4: Treatment of Claims and Interests Under the Plan

4.01 Claims and interests shall be treated as follows under this Plan:

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 - **Priority Claims** | Unimpaired | The Debtor does not believe that there are any Priority Claims in this class, but to the extent there are any allowed Priority Claims, Class 1 claimants will be paid in full in cash upon the Effective Date and are unimpaired by this Plan.<br><br>Holders of allowed Class 1 Priority Claims are unimpaired and deemed to accept the Plan. |

| Class | Impairment | Treatment |
|---|---|---|
| Class 2(a) – **Secured Claim of Merchant Financial Group** | Unimpaired | Class 2(a) is unimpaired by this Plan. It is anticipated that Misen's senior-secured lender Merchant Financial Group ("MFG") will be paid in full pursuant to a Court order during the course of this bankruptcy case. To the extent MFG's claim is not paid during the course of this bankruptcy case, it will be paid in full upon the Effective Date of the Plan.<br><br>Holders of allowed Class 2(a) Secured Claims are unimpaired and deemed to accept the Plan. |
| Class 2(b) – **Secured Claim of Saddle Creek Logistics** | Unimpaired | Class 2(b) is unimpaired by this Plan. It is anticipated that Misen's warehouse services provider Saddle Creek Logistics ("Saddle Creek") which is purported to be secured by a warehouse lien against the Debtor's inventory stored at its facilities will be paid in full pursuant to a Court order during the course of this bankruptcy case. To the extent Saddle Creek's claim is not paid during the course of this bankruptcy case, it will be paid in full upon the Effective Date of the Plan.<br><br>Holders of allowed Class 2(b) Secured Claims are unimpaired and deemed to accept the Plan. |
| Class 3(a) – **Non-Priority Unsecured Convertible Noteholder Creditors** | Impaired | Class 3(a) is impaired by this Plan. Each holder of an allowed Class 3(a) Non-Priority Unsecured Convertible Noteholder Claim has already elected, via its decision whether to participate in the DIP Loan, to receive either of the two treatments as follows:<br><br>(i) Each Non-Participating Convertible Noteholder will receive payment of its pro rata share of the Pot on account its Class 3(a) Non-Priority Unsecured Convertible Noteholder Claim on or as soon as practicable after the Effective Date; or<br><br>(ii) As the result of an arms-length pre-petition negotiation with the Participating Convertible Noteholders, each Participating Convertible Noteholder has elected to convert its Class 3(a) Non-Priority Unsecured Convertible Noteholder Claim into shares of preferred equity in the reorganized Debtor which represents 10.1% of the issued and outstanding capital stock of the reorganized Debtor.<br><br>Holders of allowed Class 3(a) Non-Priority Unsecured Convertible Noteholder Claims are impaired and entitled to vote on the Plan. |

| Class | Impairment | Treatment |
|---|---|---|
| Class 3(b) – **Non-Priority General Unsecured Creditors** | Impaired | Class 3(b) is impaired by this Plan, and each holder of an allowed Class 3(b) Non-Priority General Unsecured Claim will receive a pro rata share of the Pot on account of its allowed Class 3(b) Non-Priority General Unsecured Claim to be paid on or as soon as practicable after the Effective Date.<br><br>Holders of allowed Class 3(b) Non-Priority General Unsecured Claims are impaired and entitled to vote on the Plan. |
| Class 4 – **Equity Interests and Stock Options** | Impaired | Class 4 is impaired by this Plan. On the Effective Date of the Plan, all shares of equity in the Debtor or unexercised and unexpired stock options in the Debtor, other than those shares subject to the Pull Through, will be cancelled.<br><br>Holders of allowed Class 4 Equity Interests and Stock Options are impaired and deemed to reject the Plan. |

## Article 5: Allowance and Disallowance of Claims

5.01 **Disputed claim**  A *disputed claim* is a claim that has not been allowed or disallowed by a final non- appealable order, and as to which either:

  (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

  (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

5.02 **Delay of distribution on a disputed claim**  No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.

5.03 **Settlement of disputed claims**  The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

## Article 6: Provisions for Executory Contracts and Unexpired Leases

6.01 **Assumed executory contracts and unexpired leases**  (a) The Debtor assumes, and if applicable assigns, the executory contracts and unexpired leases to be set forth on Exhibit C as of the Effective Date of the Plan, provided, however, that the Debtor reserves its rights to (i) modify Exhibit C and remove contracts from any such schedule until the Effective Date of the Plan and (ii) file a separate motion to assume or reject certain unexpired executory

contracts until the Effective Date of the Plan. To the extent that the Debtor modifies Exhibit C, it will file an appropriate notice of modification with the Court prior to the Effective Date of the Plan.

(b) Except for executory contracts and unexpired leases that have been assumed, and if applicable assigned, before the Effective Date or under section 6.01(a) of this Plan, or that are the subject of a pending motion to assume, and if applicable assign, the Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases as of the Effective Date.

A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than the 45th day after the entry of the order confirming this Plan.

## Article 7: Means for Implementation of the Plan

Funding for the Plan will be provided by a combination of the DIP Loan and continued sales revenue. The DIP Loan will be secured by all personal property and assets of the Debtor.

The DIP Lender has agreed to (1) provide post-petition financing in the amount of up to $4,000,000 under sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code in DIP Loan funds; and (2) permit use of the DIP Lender's cash collateral through confirmation of the Debtor's Plan, upon certain terms and conditions, including the provision of adequate protection under section 361 of the Bankruptcy Code subject to final Court approval.

Upon confirmation of the Plan and the occurrence of the Effective Date, the Debtor's current management will continue in their day-to-day management of the Debtor and also administer the Plan, including, but not limited to, the filing of any objections to proofs of claim filed and asserted against the Debtor, subject to any changes made prior to the Effective Date. Prior to the Effective Date, or as soon thereafter as is practicable, the Debtor will comply with Section 8.07 hereof and amend its respective organizational documents.

The employees of the Debtor will remain in place to manage the business of the Debtor, and a new Chief Executive Officer will join the business, and all will work under the supervision of a newly constituted board, consisting of the members listed on a schedule to be filed with the Court prior to the Effective Date

The Debtor is confident that the DIP Loan will provide sufficient liquidity to ensure the Debtor can pay its debts as and when they become due and payable, until such time as the Debtor's business generates enough disposable income to do so without external assistance.

## Article 8: General Provisions

| | | |
|---|---|---|
| 8.01 | **Definitions and rules of construction** | The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan, and they are supplemented by the following definitions: N/A |
| 8.02 | **Effective date** | The Effective Date of this Plan shall be the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the Effective Date will be the first business day after the date on which the stay expires or is otherwise terminated. |
| 8.03 | **Severability** | If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan. |
| 8.04 | **Binding Effect** | The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity. |
| 8.05 | **Captions** | The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan. |
| 8.06 | **Controlling effects** | Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Delaware govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan. |
| 8.07 | **Corporate governance** | The Debtor shall amend its organizational documents, which shall amend or succeed the certificate or articles of incorporation, by-laws and other organizational documents of the reorganized Debtor to satisfy the provisions of the Plan and the Bankruptcy Code, and will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of new common and/or preferred stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan; and (iii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein. After the Effective Date, the reorganized Debtor may amend and restate its certificate or articles of incorporation and by-laws, and other applicable organizational documents, as permitted by applicable law. |
| 8.08 | **Retention of Jurisdiction** | The Bankruptcy Court may exercise jurisdiction over proceedings concerning: (i) whether the Debtor is in material default of any Plan obligation; (ii) whether the time for performing any Plan Obligation, or whether the time for assumption or rejection of leases and executory contracts should be extended; (iii) adversary proceedings and contested matters pending as of the Effective Date or specifically contemplated in this Plan to be filed in this court; (iv) whether the case should be |

> dismissed or converted to one under Chapter 7; (v) any objections to claims; (vi) compromises of controversies under Fed. R. Bankr. Pro. 9019; (vii) compensation of professionals; and (viii) other questions regarding the interpretation and enforcement of the Plan.

## Article 9: Discharge

9.01   If the Debtor's Plan is confirmed under § 1191(a), on the Effective Date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt:

(i)   imposed by this Plan; or
(ii)  to the extent provided in § 1141(d)(6).

If the Debtor's Plan is confirmed under § 1191(b), confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first 3 years of this Plan, or as otherwise provided in § 1192 of the Code. The Debtor will not be discharged from any debt:

(i)   on which the last payment is due after the first 3 years of the plan, or as otherwise provided in § 1192; or
(ii)  excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

9.02   On the Effective Date the reorganized Debtor may, in its discretion, fund the entire Pot into a segregated account (the "<u>Segregated Account</u>") to be held for the benefit of all holders of allowed claims to be paid under this Plan from the Pot. The funding in full of the Segregated Account along with payment of Class 1, Class 2(a), and Class 2(b) claims shall constitute completion of all payments due under the Plan for purposes of § 1191(b). Upon funding of the Segregated Account in full the Debtor shall be immediately entitled to a discharge of claims that are to be paid from the Pot under the Plan.

SMRH:4876-9313-0854.9
080123                                                           -10-
Case: 23-50767   Doc# 42   Filed: 08/01/23   Entered: 08/01/23 15:55:53   Page 10 of 18

## Article 10:: Other Provisions

| | | |
|---|---|---|
| 10.01 | **Material Default Defined** | If Debtor fails to make any payment, or to perform any other obligation required under the Plan, for more than 10 days after the time specified in the Plan for such payment or other performance, any member of a class affected by the default may serve upon Debtor and Debtor's attorney (if any) a written notice of Debtor's default. If Debtor fails within 30 days after the date of service of the notice of default either: (i) to cure the default; (ii) to obtain from the court an extension of time to cure the default; or (iii) to obtain from the court a determination that no default occurred, then Debtor is in Material Default under the Plan to all the members of the affected class. |
| 10.02 | **Remedies Upon Material Default** | Upon Material Default, any member of a class affected by the default may file and serve a motion to dismiss the case or to convert the case to Chapter 7 or seek other relief as appropriate. |

Respectfully submitted,

*[signature]*
_____
Signature of the Plan Proponent

Matthew J. Luckett
Authorized Officer of the Debtor
Printed Name

   /s/ *Ori Katz*
_____
Signature of the Attorney for
   the Plan Proponent

Ori Katz
Printed Name

# EXHIBIT A

# EXHIBIT A

**Chapter 7 Net Forced Liquidation Recovery ($ 000s)**                     7/14/23 Est.

| | | |
|---|---:|---|
| [1] Net Forced Liquidation Value | $ 561 | |
| | | |
| [2] Administrative Claims | (50) | |
| Total Available for Secured Claims | $ 511 | |
| | | |
| [3] Secured Claims | $ (1,868) | $511K = 27.4% |
| Total Available for Priority Claims | $ - | |
| | | |
| [4] Priority Claims | (200) | |
| Total Available for Unsecured Creditors | $ - | |

| | |
|---|---:|
| A  Employee-Related Claims | |
| B  Critical Trade Creditors | |
| C  Non-Critical Trade Creditors | 3,956 |
| D  Landlords | - |
| E  Unsecured Lenders | 4,695 |
| F  Customer Deposits & Gift Cards | 135 |
| G  Other | |
| Unsecured Claims | $ 8,786 |
| | |
| Recovery on Unsecured Claims | 0.0% |

**Notes**

[1] Assets consist of cash on hand, accounts receivable, and finished goods inventory at net forced liquidation value.
 Assumes a liquidation by Tiger Group beginning on or around 7/14/2023 and that their liquidation analysis is able to be realized.
[2] Costs and administrative fees required to complete the liquidation and wind-down in an orderly manner.
[3] Comprised of loans from the pre-petition asset-based lender and amounts payable to the warehouse.
[4] Tax, wages, PTO, and priority claims.

| Net Forced Liquidation Value Detail ($ 000s) | NFLV % | 7/14/23 Est. |
|---|---|---|
| Cash | 100.0% | $ 2 |
| Restricted Cash | 100.0% | $ 19 |
| Accounts Receivable | 98.0% | $ 328 |
| Inventory |  | $ 213 |
| Prepaid and Other Assets | 0.0% | $ - |
| Intangibles | 0.0% | $ - |
| [1] Net Forced Liquidation Value |  | $ 561 |

| Inventory Liquidation Detail | NFLV % |  |
|---|---|---|
| Warehouse 1 Aged: 0-6 Months | 12.5% | $ 877 |
| Warehouse 1 Aged: 6-12 Months | 6.4% | $ 507 |
| Warehouse 1 Aged: 12+ Months | 2.0% | $ 3,533 |
| In Transit to Warehouse 1 | 11.4% | $ - |
| Warehouse 2 | 0.0% | $ 601 |
| Production Deposits | 0.0% | $ 279 |
| [2] Inventory at Cost |  | $ 5,728 |
| Inventory at Net Forced Liquidation Value | 3.7% | $ 213 |

**Notes**
[1] Assets consist of cash on hand, accounts receivable, and finished goods inventory at net forced liquidation value.
[2] Assumes a liquidation by Tiger Group beginning on or around 7/14/2023 and that their liquidation analysis is able to be realized.

# EXHIBIT B

# EXHIBIT B

|  | Actual | Actual | Actual | Entry | Exit | Projected | Projected | Projected | Projected |
|---|---|---|---|---|---|---|---|---|---|
|  | 12ME 12/31/21 | 12ME 12/31/22 | 6ME 6/30/23 | 7/14/2023 | 8/31/2023 | 4ME 12/31/23 | 12ME 12/31/24 | 12ME 12/31/25 | 12ME 12/31/26 |

**Cash Flow**

|  | Actual 12ME 12/31/21 | Actual 12ME 12/31/22 | Actual 6ME 6/30/23 | Entry 7/14/2023 | Exit 8/31/2023 | Projected 4ME 12/31/23 | Projected 12ME 12/31/24 | Projected 12ME 12/31/25 | Projected 12ME 12/31/26 |
|---|---|---|---|---|---|---|---|---|---|
| Net Income | ($7,335,616) | ($4,416,091) | $1,145,245 |  | ($374,938) | ($222,009) | ($35,992) | $76,515 | $91,466 |
| D&A | $200,937 | $269,919 | $41,174 |  | - | - | - | - | - |
| CapEx & Other | ($592,620) | ($51,033) | $295,485 |  |  |  |  |  |  |
| **Cash from Ops & CapEx** | **($7,727,298)** | **($4,197,205)** | **$1,481,904** |  | **($374,938)** | **($222,009)** | **($35,992)** | **$76,515** | **$91,466** |
| LCs/Prod Deposits | - | ($522,319) | $522,319 |  |  |  |  |  |  |
| Accounts Receivables | ($789,714) | ($174,650) | $798,839 |  |  | ($321,827) | ($104,712) | ($98,001) | ($117,150) |
| Inventory | ($7,498,713) | $4,419,038 | $1,061,782 |  | ($944,690) | $937,869 | - | ($229,385) | ($417,481) |
| Prepaid Expenses | $113,510 | $75,987 | $169,583 |  |  |  |  |  |  |
| Other Current Assets | $37,647 | $39,760 | - |  |  | - | - | - | - |
| Accounts Payable | $2,339,984 | $287,962 | ($433,835) |  |  | $50,000 | $100,000 | $150,000 | $300,000 |
| Deferred Revenue | ($1,336,871) | ($2,694,240) | ($1,184,104) |  |  | - | - | - | - |
| Accrued Expense | $878,238 | ($773,602) | ($248,085) |  |  | - | - | - | - |
| Accrued Returns | - | $143,443 | ($143,443) |  |  |  |  |  |  |
| Accrued Warranty | $190,000 | - | ($415,000) |  |  | - | - | - | - |
| Sales Tax Payable - Current | $434,981 | ($223,011) | ($83,437) |  |  | - | $305,764 | $98,854 | $118,170 |
| Sales Tax Payable - Other | - | - | $181,125 |  |  |  |  |  |  |
| Other Current Liabilities | $5,208 | $32,677 | $49,727 |  |  | - | - | - | - |
| **Working Capital** | **($5,625,731)** | **$611,044** | **$275,472** |  | **($944,690)** | **$666,043** | **$301,051** | **($78,532)** | **($116,461)** |
| Credit Cards |  | $290,905 | ($148,321) | ($661,069) |  |  |  |  |  |
| Chase Line of Credit |  | $497,556 | ($497,556) | - |  |  |  |  |  |
| Merchant Financial ABL |  | - | $2,944,122 | ($1,317,822) |  | ($1,677,075) |  |  |  |
| Warehouse Lienholder |  |  | ($700,000) |  |  | ($348,812) |  |  |  |
| Exit Payments |  |  |  |  |  | ($214,064) |  |  |  |
| Cedar Park Ventures ABL |  | - | - | - |  | $1,000,000 | ($650,000) | ($350,000) |  |
| Convertible Note |  | $4,682,768 | $7,957 | $3,924 |  |  |  |  |  |
| Cedar Park Draw Notes => Equity |  | $89,992 | - | - |  | $3,000,000 |  |  |  |
| **Financing** |  | **$5,561,221** | **$1,606,201** | **($1,974,967)** |  | **$1,760,050** | **($650,000)** | **($350,000)** | **-** | **-** |
| **Net Cash Flow** | **($7,791,808)** | **($1,979,959)** | **($217,591)** |  | **$440,422** | **($205,966)** | **($84,941)** | **($2,017)** | **($24,995)** |
| Beginning Cash | $10,212,427 | $2,420,619 | $440,660 |  | $1,860 | $442,281 | $236,315 | $151,374 | $149,356 |
| **Ending Cash** | **$2,420,619** | **$440,660** | **$223,068** | **$1,860** | **$442,281** | **$236,315** | **$151,374** | **$149,356** | **$124,361** |

Case: 23-50767    Doc# 42    Filed: 08/01/23    Entered: 08/01/23 15:55:53    Page 16 of 18

# EXHIBIT C

# EXHIBIT C

**2023.08.01 Misen Inc. Assumed Contracts**

| No. | Description | Counterparty | Term | As Of / Date Signed |
|---|---|---|---|---|
| 1 | Sales Platform | Amazon | Month-to-Month | Not Available |
| 2 | " | Shopify | Month-to-Month | Not Available |
| 3 | " | Paypal | Month-to-Month | Not Available |
| 4 | " | Affirm | Per Usage | Not Available |
| 5 | " | Stripe | Per Usage | Not Available |
| 6 | " | Pro Home Cooks LLC | Per Usage | Signed 7/7/2022 |
| 7 | Sales Tax Compliance | Avalara | 6 Months | Renewed April 2023 |
| 8 | Logistics Services | Saddle Creek Logistics | June 30, 2024 | Signed 5/26/2021 |
| 9 | " | Flexport | Per Usage | Terms of Service |
| 10 | " | RXO | Per Usage | Signed 3/8/2023 |
| 11 | Engraving | Stylux | 10 Months Left | Signed 5/17/2023 |
| 12 | Manufacturer | Darex LLC DBA WorkSharp | Per Usage | Signed 4/19/2023 |
| 13 | Customer Service | Ninja Partners LLC | Month-to-Month | Signed 3/4/2022 |
| 14 | Marketing - SMS | Attentive Mobile | 9/1/22-9/1/23 | Signed 7/11/2022 |
| 15 | Insurance - Cyber | Coalition Insurance Svcs | Annual | Renewed 8/12/2023 |
| 16 | Insurance - Gen. Liab. | Federal Insurance/Chubb | Annual | Renewed 6/29/2023 |
| 17 | Email / Cloud | Google | Month-to-Month | Terms of Service |
| 18 | US Mail | iPostal1, LLC | Month-to-Month | Terms of Service |
| 19 | Platform Integrator | PackageBee | Month-to-Month | Signed 06/26/2020 |
| 20 | Accounting Software | Quickbooks | Month-to-Month | Terms of Service |
| 21 | Order Mgmt Sware | Skubana, Inc. | Sep 30, 2023 | Signed 9/7/22 |
| 22 | Software service | Slack | Month-to-Month | Terms of Service |
| 23 | Office Space | WeWork | Month-to-Month | Terms of Service |
| 24 | Justworks | Payroll Processing | Month-to-Month | Signed 11/15/2017 |
| 25 | Executive Employment | Omar Rada | Ends 11/30/23 | Signed 7/17/2023 |
| 26 | Executive Employment | Michael Mahoney | Not Applicable | Signed 7/11/2023 |
| 27 | Executive Search | Bring Ruckus, Inc. | Not Applicable | Signed 1/30/2023 |